# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## PEOPLE v FENDERSON

Docket No. 167391. Argued on application for leave to appeal March 12, 2026. Decided July 14, 2026.

Daren D. Fenderson was bound over to the Wayne Circuit Court on charges of first-degree premeditated murder, MCL 750.316(1)(a); felony-firearm, MCL 750.227b; and escape from lawful custody, MCL 750.197a. Defendant was arrested and jailed in connection with a fatal shooting. Police read defendant his rights under *Miranda v Arizona*, 384 US 436 (1966), but police were unable to interrogate defendant at that time because they believed that he was intoxicated. The following day, Detroit Police Sergeant Reginald Beasley and Detective Douglas Williams conducted a videorecorded interrogation. Beasley provided standard *Miranda* warnings, and defendant voluntarily signed an advice-of-rights form. After an hour of questioning, police told defendant that there were a lot of holes in his story and that they had conducted research, including watching surveillance videos and speaking with witnesses. Beasley further indicated that someone who looked at the evidence would ask themselves whether defendant was a callous killer; Beasley told defendant several times that pictures of the victim were "fucked up" and that police had a "video of it happening." At this point, defendant invoked his right to counsel. Beasley asked if defendant had an attorney. Defendant indicated that he would need appointed counsel and asked how long that would take. Beasley said that he was not sure but that he would "make a couple phone calls."

Beasley returned about 40 minutes after defendant's invocation and told him that he was "trying to get that attorney." Two hours and 45 minutes after defendant invoked his right to counsel, Beasley returned; he did not address defendant or provide him with information about efforts to locate an attorney. Beasley was accompanied by a uniformed officer who removed defendant's handcuffs and then had defendant turn around so that he could handcuff defendant with his arms behind his back. Defendant then asked where his lawyer was. The audio of the interrogation video is difficult to decipher, but Beasley responded either "You don't got one" or "You don't get one." Defendant expressed confusion, and Beasley told defendant that police tried to call a lawyer but nobody was available and defendant had no money. Defendant asked whether he could use the money he had in his possession when he was arrested, and Beasley said that he couldn't use that money.

Defendant then asked, "So what's going on?" Beasley stated that defendant had asked for an attorney and that he could not speak to defendant without one, "[s]o the story you got is the story we gon' go with." Defendant again expressed confusion, and Beasley asked defendant what he was confused about. Defendant responded that he didn't know what was going on and that police hadn't told him anything. Beasley stated that police would take defendant back to the Detroit Detention Center and submit a warrant that a prosecutor would review. Defendant told Beasley that he didn't know what that meant, and Beasley responded that defendant had requested an attorney so he couldn't speak to defendant about the case, but that if defendant wanted to talk, defendant had to say he wanted to talk without an attorney. Defendant then repeatedly said that he wanted "to get this over with," and Beasley responded that he could go over defendant's rights with him again if he agreed to talk without an attorney. Defendant agreed to talk without an attorney and again expressed that he wanted "to get this over with." Beasley stated that he didn't want defendant to feel compelled to talk to him, but that if defendant wanted to talk without an attorney present, Beasley would talk to defendant. Defendant said, "Yeah." Beasley again stated that he didn't want defendant to feel forced to do anything and asked, "Is that something you want to do?" Defendant said, "Yes."

Beasley and the uniformed officers accompanying him left the interrogation room, and defendant started crying. Another sergeant, who was not connected with the investigation and who had not previously spoken to defendant, entered the room. Defendant said, "I don't understand this." The sergeant stated that his role was to reestablish defendant's rights, and he read the standard *Miranda* warnings again. After each warning, the sergeant asked defendant if he understood his rights. Defendant responded with a mix of verbal agreement and nonverbal affirmative head nods. When the sergeant asked if anyone had forced, threatened, or coerced defendant to make a statement, defendant responded, "See, that's what I . . . I don't understand what's going on." The sergeant asked if defendant wanted to talk to police, and defendant agreed. Defendant initialed another advice-of-rights form, and the sergeant left. Beasley and Williams returned, and defendant made incriminating statements.

Defendant moved to suppress the incriminating statements in the trial court on the grounds that he did not voluntarily, knowingly, and intelligently waive his *Miranda* right to counsel. The court, Wanda A. Evans, J., granted defendant's motion to suppress, concluding that police communications with defendant had frustrated the advice of rights required by *Miranda*. The trial court also concluded that police reinitiated the interrogation after defendant's invocation by readministering *Miranda* warnings. The prosecution sought leave to appeal in the Court of Appeals, and the Court of Appeals, SWARTZLE, P.J., and SERVITTO, J. (GARRETT, J., dissenting), reversed the suppression of defendant's statements in an unpublished per curiam opinion, issued June 6, 2024 (Docket No. 367926). Defendant sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application. 516 Mich 934 (2025).

In an opinion by Justice THOMAS, joined by Chief Justice CAVANAGH and Justices BERNSTEIN, WELCH, BOLDEN, and HOOD, the Supreme Court, in lieu of granting leave to appeal, *held*:

Defendant's Fifth Amendment rights under *Miranda* were violated. Under *Edwards v Arizona*, 451 US 477 (1981), statements following the invocation of counsel are admissible only

if counsel is made available to the suspect for questioning or if the state shows that the suspect himself reinitiated the investigation. In this case, defendant initially waived his *Miranda* rights but later asserted his right to appointed counsel. However, defendant was not provided counsel and was told he did not have and could not obtain counsel. The statements police made in this case after defendant's invocation of counsel can reasonably be understood as suggesting that defendant's right to have an attorney present during questioning was dependent on his ability to retain counsel through his own funds; these statements are not consistent with *Miranda*'s assertions that suspects have a right to counsel and that, if they cannot afford counsel, counsel will be provided. Defendant's confusion and lack of understanding was apparent from the record: defendant repeatedly told police that he was confused and didn't understand, and defendant asked multiple clarifying questions. The police did not err because they failed to provide an attorney; the police here erred by suggesting that defendant could not be questioned with an attorney present because he did not have the money to hire one. This confusing and inaccurate information undermined the advice of rights previously read to defendant. By undermining the advice of rights and implying that the right to have an attorney present during questioning was predicated on the ability to pay for an attorney, police in this case violated defendant's Fifth Amendment right to counsel under *Miranda*. Furthermore, the prosecution did not show that defendant reinitiated the investigation. Defendant's question, "So what's going on?" could not reasonably be considered an affirmative request to reinitiate the interrogation without an attorney. Defendant asked this question in the context of a discussion about whether, having invoked his right to counsel, he had an attorney and whether he could use the money he had for an attorney. As a result, the subsequent *Miranda* waiver and questioning did not overcome *Edwards* and the confusion created about defendant's right to counsel.

Finally, police engaged in the functional equivalent of questioning when defendant asked what was going on. After defendant was told that he did not have an attorney and could not use his money for an attorney, police continued the same theme from prior to defendant's invocation of counsel, where they suggested that defendant's story had holes and did not make sense. Police told defendant that a waiver of his rights was the way to tell another story and that otherwise he would be stuck with the prior story. Accordingly, police undermined the advice of rights required by *Miranda* and impermissibly continued the interrogation after defendant invoked his right to counsel. Defendant's statements subsequent to invocation of his right to counsel must be suppressed.

Court of Appeals' judgment reversed; case remanded to the Wayne Circuit Court for further proceedings.

Justice ZAHRA, dissenting, would have affirmed the Court of Appeals' judgment that defendant's decision to waive his rights was made voluntarily, knowingly, and intelligently and that the officers did not violate defendant's right to be free from self-incrimination under the Fifth Amendment of the United States Constitution or Article 1, § 17 of the 1963 Michigan Constitution. The police did everything they were constitutionally required to do in this case. They ceased questioning immediately once defendant requested an attorney; they attempted to locate an attorney for defendant; they informed defendant that they could not question defendant any further about the case because they could not find an attorney to counsel defendant during the interrogation; when asked, they explained to defendant what the next steps in the process would

be; and when defendant stated that he wanted to talk without an attorney, they asked defendant to make sure that is what he wanted, repeatedly told him not to feel compelled to speak to them, and informed him of his rights again before accepting his waiver.  This police conduct was not only constitutionally acceptable but required under the law.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 14, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                       No. 167391

DAREN DONELL FENDERSON,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

THOMAS, J.

Defendant, Daren Fenderson, awaits trial on charges of first-degree premeditated murder, felony-firearm, and escape from lawful custody. We heard oral argument to determine whether the Court of Appeals erred by reversing the trial court's decision to grant defendant's motion to suppress statements he made during a custodial interrogation. We find that it did. In this instance, police provided *Miranda* warnings, and defendant asserted his right to have an attorney present during questioning and his right to have

counsel provided at the public's expense.[1]  After the invocation of these rights, police must either provide counsel for a suspect or terminate the interrogation.[2]  In this case, after defendant invoked his right to counsel, police tried to obtain an attorney for him.  They returned empty-handed, over two and a half hours later, telling defendant that he did not have an attorney and could not use the money taken from him during arrest to obtain one.  Thereafter, in response to defendant's questions about what was going on, police resumed the interrogation.  We agree with the trial court that defendant's Fifth Amendment rights under *Miranda* were violated.[3]  We therefore reverse the judgment of the Court of Appeals and remand this case to the Wayne Circuit Court for further proceedings not inconsistent with this opinion.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  INTERROGATION

Defendant was arrested and jailed in connection with a fatal shooting.  The victim of the shooting was found pinned between a crashed vehicle and the front porch of a house.  After defendant was arrested, police read him his *Miranda* rights, but they were unable to interrogate him at that time because they believed that he was intoxicated.  The following day, Detroit Police Sergeant Reginald Beasley and Detective Douglas Williams conducted a videorecorded interrogation.  Beasley provided standard *Miranda* warnings, and

---

[1] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

[3] US Const, Am V; Const 1963, art 1, § 17; *Miranda*, 384 US at 444; see also *People v Cipriano*, 431 Mich 315, 330-331; 429 NW2d 781 (1988); *Edwards*, 451 US at 484-485; *People v Paintman*, 412 Mich 518, 524-526; 315 NW2d 418 (1982).

2

Fenderson voluntarily signed an advice-of-rights form. At that point, Fenderson indicated a desire to continue the interrogation without counsel, stating that he did not need a lawyer and that "[e]verything'll be good." He did, however, ask if it would be best to have a lawyer present. Williams told him, "That is up to you, sir." Fenderson then asked how long it would take to get a lawyer. Williams said he had "no idea" and asked defendant if he had a lawyer. Fenderson said he did not, but he referenced the advice-of-rights form and noted where it indicated that a lawyer would be appointed. At that moment, Fenderson did not invoke his right to counsel. He stated that he did not want to take up his interrogators' time or his own waiting for a lawyer.

During the initial portion of the interrogation, Fenderson described being with the victim during an alleged carjacking. After an hour of questioning, the officers called into question Fenderson's statements. Beasley told defendant, "There's a lot of—lot of holes in your story, alright?" Among other things, Beasley also told defendant that prior to the interrogation, he and Williams had conducted research—he said they watched surveillance videos, spoke to people in the neighborhood, and talked to defendant's mother—and that he believed that some of what Fenderson was saying was not true and didn't "make any sense."

Beasley then told defendant that he didn't want defendant to "tell a story . . . that's not true," implying that it wouldn't fit with the evidence. Beasley indicated that someone who did look at the evidence would ask themselves, "Man, is he a—a callous killer?" Defendant insisted that he did not kill anyone. Both Beasley and Williams confronted defendant with additional perceived inconsistencies in his story.

3

After more than an hour and a half of questioning, and after Williams had exited the interrogation room, Beasley asked defendant if he would be willing to take a polygraph exam. Defendant asked if his lawyer could be present for that. Beasley said that it would be possible, and defendant agreed to be polygraphed. No polygraph exam was administered. Beasley then told defendant several times that the pictures of the victim were "fucked up," that police had a "video of it happening,"[4] and that anyone who saw what happened to the victim would say, " 'Oh shit, that's fucked up.' "

The parties agree that defendant then invoked his right to counsel. Beasley asked if defendant already had an attorney. Defendant indicated that he did not and that he would need appointed counsel. He inquired how long that would take. Beasley said that he was not sure but that he would "make a couple phone calls."

Beasley then left defendant alone in the interrogation room. Fenderson was later provided with a soda, and he declined an offer of chips. Beasley returned about 40 minutes after Fenderson's invocation and told him that he was "trying to get that attorney." Defendant requested to use the bathroom, was handcuffed with his arms in front, and was escorted out of the interrogation room. He returned moments later and was left alone and handcuffed.

---

[4] Amicus curiae The Innocence Project argues that this was a false-evidence ploy and urges this Court to adopt a per se rule that statements made after such a ploy are inadmissible. Such a ruling would be premature; the record before this Court does not show whether video footage of the shooting does or does not exist. We note, however, that the use of false-evidence ploys can be considered in the voluntariness inquiry under existing caselaw. See *People v Stewart*, 512 Mich 472, 498-499; 999 NW2d 717 (2023) (concluding that officers' lies about having an eyewitness placing defendant at the scene of a robbery and having home-surveillance video were exaggerations of the strength of the case against defendant, which weighed in favor of involuntariness).

4

Approximately two hours and 45 minutes after defendant invoked his right to counsel, Beasley returned. Beasley did not address defendant or provide him with information about efforts to locate an attorney. Beasley was accompanied by a uniformed officer who removed defendant's handcuffs and then had defendant turn around so that he could handcuff defendant with his arms behind his back. This exchange followed:

> *Defendant*: Where . . . where my lawyer?
>
> *Beasley*: You don't got one . . . so . . .[5]
>
> *Defendant*: Wait . . . huh?
>
> *Beasley*: You don't have a lawyer. You got one?
>
> *Defendant*: No . . . I . . . you said . . .
>
> *Beasley*: We tried to get . . . we tried to call one. Ain't nobody available and you ain't got no money . . . so . . .
>
> *Defendant*: Yeah I do. The money that I came in with. You can't use . . . that?
>
> *Beasley*: I can't use that money.
>
> *Defendant*: Aww come on.

---

[5] The audio of the interrogation video is difficult to decipher at some points. Defendant states that Beasley said, "You don't get one." We believe that Beasley actually says, "You don't got one," and we base our analysis on that interpretation of the video. Judge GARRETT also quotes this interaction as "You don't got one . . . ." *People v Fenderson*, unpublished per curiam opinion of the Court of Appeals, issued June 6, 2024 (Docket No. 367926) (GARRETT, J., dissenting), p 2. The trial court paraphrased this interaction in its oral opinion, stating that the police told defendant, "[W]e don't have any, you don't get one . . . ." Neither the Court of Appeals' majority opinion nor the prosecution in its briefing quotes this interaction.

Beasley then said, "So." Defendant replied, "So what's going on?" Beasley stated that defendant had asked for an attorney and that he could not speak to defendant without one, "[s]o the story you got is the story we gon' go with."

Fenderson then said he was "confused," and Beasley asked him what he was confused about. The following series of exchanges then occurred, which ended with defendant saying that he would be willing to talk to police without an attorney.

> *Defendant*: The story . . . I . . . I don't know what's going on from this point. You ain't told me nothin'.

> *Beasley*: Ok. So what's going to happen now. We're gonna take you back to [the Detroit Detention Center (DDC)]. Then we gonna submit a warrant and the prosecutor will review it. Alright?

> *Defendant*: That mean, I'm not sure what all that means.

> *Beasley*: You requested an attorney. I can't, I can't talk to you any more about the case. . . . Now if you wanted to talk to me, you just say that you want, you want to talk without an attorney. I can talk to you. But you said you wanted an attorney. I'm not allowed to talk to you by law.

> *Defendant*: I just want to get this over with. If you tryna talk we can talk. I just want to get this over with. That's it. I just want to get this over with.

> *Beasley*: Like I said, I can go over your rights again with you, if you agree to talk without an attorney.

> *Defendant*: I agree to talk without an attorney. Y'all heard that. I agree. I just want to get this over with.

> *Beasley*: I don't want you to feel compelled to talk to me because you don't want to go with them. That's the thing. But if you reasonably want to talk to me without an attorney present, I—I'll talk to you. But you understand that's something that you want to do.

> *Defendant*: Yeah.

> *Beasley*: I don't want you to feel like you're forced to—

*Defendant*: Ok.

*Beasley*: —do anything. Is that something you want to do?

*Defendant*: Yes.

After these exchanges, Beasley and the uniformed officers accompanying him left the interrogation room, and defendant started crying. Then another sergeant, who was not connected with the investigation and who had not previously spoken to defendant, entered the room. Defendant said, "I don't understand this." That sergeant stated his role was to reestablish defendant's rights, and he read the standard *Miranda* warnings again. After each warning, the sergeant asked defendant if he understood his rights. Defendant responded with a mix of verbal agreement and nonverbal affirmative head nods. When the sergeant asked if anyone had forced, threatened, or coerced defendant to make a statement, defendant responded, "See, that's what I . . . I don't understand what's going on." The sergeant asked if defendant wanted to talk to police, and defendant agreed. Defendant initialed another advice-of-rights form, and the sergeant left.

Beasley and Williams returned, and defendant made incriminating statements. Defendant sought to suppress those statements in the trial court on the grounds that he did not voluntarily, knowingly, and intelligently waive his *Miranda* right to counsel.

B. TRIAL COURT'S SUPPRESSION ORDER

The trial court granted defendant's motion to suppress in a short bench ruling, concluding that police communications with defendant had frustrated the advice of rights required by *Miranda*. The trial judge had reviewed the interrogation video prior to issuing a ruling. The court discussed Beasley's statements about defendant's lack of attorney and inability to afford an attorney, including telling defendant, " 'You don't have the money to

7

pay for one,' " and that defendant, then, didn't have one.[6]  This "really cause[d] some conflict" for the trial court in light of *Miranda*'s protections concerning both the right to have an attorney present during questioning and the right to have an attorney appointed if the suspect could not afford one.

The trial court expressed concern that this put "extra pressure" on defendant, who had been interrogated for hours, and found that police used the fact that no lawyer was available as a "scare tactic" to get defendant "to start talking again."  The trial court also found that police reinitiated the interrogation after defendant's invocation by readministering *Miranda* warnings.

### C.  COURT OF APPEALS' REVERSAL

The Court of Appeals granted the prosecution's application for leave to appeal and reversed the suppression of defendant's statements in an unpublished per curiam opinion over the dissent of Judge GARRETT.  *People v Fenderson*, unpublished per curiam opinion of the Court of Appeals, issued June 6, 2024 (Docket No. 367926).

With regard to waiver, the majority first noted that "defendant signed multiple forms that indicated that he understood his constitutional right to counsel" and that he "was fully informed of his constitutional rights on three separate occasions, and he affirmed that he understood his rights each time."  *Id*. at 3-4.  With regard to police statements about defendant's inability to afford an attorney on which the trial court relied in suppressing defendant's statements, the majority characterized the exchange in the following terms: "One of the officers explained to defendant that they could not find defendant an attorney,

---

[6] In the trial court's words, Beasley told defendant: " 'You don't have the money to pay for one.  You don't have one.  We don't have any available, so you don't get a lawyer.' "

8

and he did not have funds to hire his own attorney, so they were going to return him to the detention center." *Id*. at 2. In its statement of the law, the majority cited *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981), and acknowledged that an interrogation must stop when a suspect invokes their right to counsel, *Fenderson*, unpub op at 3, but in its analysis, the majority essentially conducted a standard totality-of-the-circumstances inquiry into whether the waiver was knowing, intelligent, and voluntary, *id*. at 3-4. Noting that defendant was 24 years old at the time of the interrogation, had completed three years of high-school education, was not "intoxicated, drugged, or otherwise incapacitated," and "was not physically or psychologically abused or threatened in any way," the majority concluded that his waiver was valid. *Id*. at 3-5.

In dissent, Judge GARRETT noted possible irregularities with the process that police followed to procure counsel for defendant.[7] *Id*. (GARRETT, J., dissenting) at 4-5. She would have found defendant's waiver invalid based on Beasley's "incomplete and contradictory statements" that "misled Fenderson into believing he would not be appointed counsel." *Id*. at 5. Judge GARRETT did not believe that rereading defendant the *Miranda* rights cured this error, as it was clear that he was confused about his rights and "no one questioned Fenderson to ascertain whether his confusion or lack of understanding had resolved." *Id*. at 6.

---

[7] At oral argument, the panel questioned whether police followed protocol in their efforts to secure an attorney for defendant. As established at the preliminary examination, police attempted to call a line-up attorney rather than contacting a central department. They averred that they spent about 10 to 15 minutes trying to find an attorney but did not document those efforts or describe them with specificity in their testimony.

The Court of Appeals did not explicitly place the burden on the state to show that after invocation of the right to counsel defendant reinitiated questioning and that his subsequent waiver was knowing and intelligent. The panel did consider whether police improperly reinitiated interrogation after defendant invoked his right to counsel. The majority concluded that they did not and that by returning defendant to jail after they were unable to find an attorney for him, they were properly ending contact with defendant. *Id.* (opinion of the Court) at 4. The majority stated that "defendant was able to make a voluntary, informed decision to reinitiate the conversation" and made "multiple unequivocal requests to speak to the officers without an attorney present." *Id.*

Judge GARRETT dissented on this point as well. She would have concluded that defendant's "decision to speak to the officers without counsel was a direct result of the uniformed officer cuffing his hands behind his back and Sergeant Beasley's confusing and misleading statements that there was no attorney available to represent Fenderson and that Fenderson could not afford to retain an attorney." *Id.* (GARRETT, J., dissenting) at 5. Rather than reinitiating, defendant was "backed into a corner and agreed to continue without counsel as a result of the coercive atmosphere created by Sergeant Beasley." *Id.*

This Court ordered oral argument on defendant's application for leave to appeal. *People v Fenderson*, 516 Mich 934 (2025).

10

## II.  LAW AND ANALYSIS

### A.  STANDARD OF REVIEW

We review a trial court's factual findings in a ruling on a motion to suppress for clear error.  *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014).[8]  To the extent that the trial court's ruling involves an interpretation of the law or the application of a constitutional standard, review is de novo.  *Id*.

### B.  CONSTITUTIONAL FRAMEWORK

Statements of an accused made during custodial interrogation are inadmissible absent a voluntary, knowing, and intelligent waiver of the accused's Fifth Amendment rights.  *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966); US Const, Am V.[9]  The suspect must be told that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the

---

[8] We note that many of the trial court's findings of fact are based on review of the interrogation video.  Jurisdictions are split on whether lower courts should be afforded deference where video evidence is concerned.  Compare, for example, *Robinson v State*, 5 NE3d 362, 365 (Ind, 2014) (applying clear-error review to video evidence because "[w]hile technology marches on, the appellate standard of review remains constant"), with *Commonwealth v Novo*, 442 Mass 262, 266; 812 NE2d 1169 (2004) (applying de novo review because an appellate court is in the same position as the trial court judge in viewing the videotape).  A per curiam Court of Appeals panel has previously stated that it "need not rely on the trial court's conclusions as to what the video contains," *People v Kavanaugh*, 320 Mich App 293, 298; 907 NW2d 845 (2017), a decision that this Court has previously left undisturbed due to lack of argument by the parties, *Stewart*, 512 Mich at 500 n 13.  We do not address the issue here other than to note that it is an important question that should be addressed in a case in which it is raised and litigated by the parties.

[9] "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  US Const, Am V.

presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 US at 479.

The Michigan Constitution also provides the right to be free from self-incrimination. Const 1963, art 1, § 17.[10] Generally, the Michigan Constitution is at least as protective as the United States Constitution, *Oregon v Hass*, 420 US 714, 719; 95 S Ct 1215; 43 L Ed 2d 570 (1975), and we "may interpret our constitution to afford greater protections than those afforded by the Fifth Amendment" with respect to the right against self-incrimination, *Tanner*, 496 Mich at 237.

Michigan has a common-law prohibition of the introduction of coerced confessions, see, e.g., *Flagg v People*, 40 Mich 706, 709 (1879), and a long tradition of recognizing the constitutional right to be free from compelled self-incrimination even prior to incorporation of the Fifth Amendment against the states.[11] This Court has previously recognized that

___

[10] "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed." Const 1963, art 1, § 17.

[11] See, e.g., *People v Conte*, 421 Mich 704, 721-724; 365 NW2d 648 (1984) (opinion by WILLIAMS, C.J.) (outlining the history of the state constitutional basis for suppressing involuntary confessions); *People v Cavanaugh*, 246 Mich 680, 686; 225 NW 501 (1929) (providing that "a confession, extorted by mental disquietude, induced by unlawfully holding an accused incommunicado, is condemned by every principle of fairness . . . [and] is forbidden by the constitutional guaranty of due process of law"); *People v Clarke*, 105 Mich 169, 176; 62 NW 1117 (1895) ("Confessions are inadmissible when induced by threats, or by a promise of favor, made by persons apparently acting by authority."); *People v Prestidge*, 182 Mich 80, 85-86; 148 NW 347 (1914) (concluding that a confession was inadmissible on voluntariness grounds where officers' "zeal clearly outran their duty" in "grilling" for two or three hours a man who was "very nervous and nearly crazy").

Article 1, § 17 provides broader due-process protection than the federal Constitution[12] but has also rejected arguments that the self-incrimination clause of Article 1, § 17 provides broader protections relative to the federal Constitution in certain contexts.[13]  We have not considered whether our Constitution provides greater protection under the voluntariness prong of the waiver analysis.[14]

"[W]hen a suspect has been afforded *Miranda* warnings and affirmatively waives his *Miranda* rights, subsequent incriminating statements may be used against him" if the waiver was " 'voluntarily, knowingly, and intelligently' " made.  *Tanner*, 496 Mich at 209, quoting *Miranda*, 384 US at 444.  The government bears a "heavy burden" to show that the accused waived the privilege against self-incrimination and the right to counsel. *Miranda*, 384 US at 475.  The government must meet this burden by a preponderance of

---

[12] See, e.g., *AFT Mich v Michigan*, 497 Mich 197, 245 n 28; 866 NW2d 782 (2015) (noting that this Court "has, on occasion, applied distinctive due process protections under Const 1963, art 1, § 17 broader than have been afforded under US Const, Am XIV"); *In re Render*, 145 Mich App 344, 348; 377 NW2d 421 (1985) (providing that Article 1, § 17 requires appointment of counsel at termination-of-parental-rights proceedings but that the Fourteenth Amendment does not); *Delta Charter Twp v Dinolfo*, 419 Mich 253, 265-266, 272-278; 351 NW2d 831 (1984) (concluding that the state Constitution provides more protection against arbitrary zoning regulations than the federal Due Process Clause).

[13] See *Tanner*, 496 Mich at 244 (concluding that the state Constitution does not "require[] a greater showing that a *Miranda* waiver was made 'knowingly' than is required by the Fifth Amendment, given that this Court's interpretation of Article 1, § 17 has indicated that it pertains solely to the voluntariness of a confession itself, not to whether a confession is made with full knowledge of its consequences").

[14] See *People v Daoud*, 462 Mich 621, 633-639; 614 NW2d 152 (2000) (noting that determining whether a waiver is voluntary or whether a waiver is knowing and intelligent are separate questions that courts must assess to determine whether a waiver is valid); see also *Berghuis v Thompkins*, 560 US 370, 382-383; 130 S Ct 2250; 176 L Ed 2d 1098 (2010) (noting that a waiver must be both voluntary and knowing).

the evidence. *People v Cheatham*, 453 Mich 1, 27; 551 NW2d 355 (1996) (opinion by BOYLE, J.); *Colorado v Connelly*, 479 US 157, 168; 107 S Ct 515; 93 L Ed 2d 473 (1986).

## C. QUESTIONING AFTER THE INVOCATION OF THE RIGHT TO COUNSEL

In this case, defendant initially waived his *Miranda* rights but later asserted his right to appointed counsel. After invocation of the Fifth Amendment right to counsel, questioning of a suspect must cease. *Edwards*, 451 US at 482; *People v Paintman*, 412 Mich 518, 527; 315 NW2d 418 (1982). In *Edwards*, the United States Supreme Court created a prophylactic "presumption of involuntariness" following the invocation of the right to counsel. *Maryland v Shatzer*, 559 US 98, 106; 130 S Ct 1213; 175 L Ed 2d 1045 (2010). Typically, a knowing and voluntary *Miranda* waiver, as described above, will be sufficient at the time of questioning to allow the admission of a subsequent statement. Not so under *Edwards*. The *Edwards* Court determined that the "traditional standard for waiver was not sufficient to protect a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel; 'additional safeguards' were necessary." *Shatzer*, 559 US at 104, quoting *Edwards*, 451 US at 484. The rationale of *Edwards* is that "if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v Roberson*, 486 US 675, 681; 108 S Ct 2093; 100 L Ed 2d 704 (1988), quoting *Miranda*, 384 US at 467.

A valid waiver of that right "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 US at 484. Statements following the invocation of counsel are admissible only if counsel is made available to the suspect for questioning or if the state shows that the suspect himself reinitiated the investigation. *Id*. at 484-485.[15] The *Edwards* reinitiation rule is grounded in the concern that "a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel . . . ." *Shatzer*, 559 US at 106.

## 1. DEFENDANT WAS NOT PROVIDED COUNSEL AND WAS TOLD HE DID NOT HAVE AND COULD NOT OBTAIN COUNSEL

Defendant was not provided with counsel. Instead, after having defendant wait two and a half hours for an attorney, police engaged defendant in a conversation that the trial court described as a "scare tactic" that undermined defendant's assertion of the right to counsel. We consider police statements "in their totality" when assessing "whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v Eagan*, 492 US 195, 203, 205; 109 S Ct 2875; 106 L Ed 2d 166 (1989) (quotation marks, citation, and brackets omitted). Independent of the *Edwards* presumption of involuntariness, police who give "confusing and inaccurate" advice about the *Miranda* warnings, even when the standard rights have been provided, do not "reasonably convey" a suspect's rights. *Green v United States*, 315 A3d 680, 685, 687 (DC, 2024); *id*. at 685

---

[15] See also *Shatzer*, 559 US at 104. Though not at issue in this case, postinvocation statements are admissible if there is a sufficient "break in custody" between the invocation of rights and the subsequent statement. *Id*. at 111.

(concluding that police presented a "mixed picture" about whether the suspect could be provided an attorney before and during interrogation); see also *United States v San Juan-Cruz*, 314 F3d 384, 388 (CA 9, 2002) (holding that "confusing" and conflicting warnings rendered the waiver invalid because the suspect "could not reasonably ascertain from the warnings provided to him by the Government whether he could or could not retain the services of an attorney for free"); *State v Mayer*, 184 Wash 2d 548, 562; 362 P3d 745 (2015) (stating that conflicting instructions can render *Miranda* invalid, and citing *San Juan-Cruz*).

In the context of a suspect invoking the *Miranda* right to silence, the United States Supreme Court has expressed concern about "police strateg[ies] adapted to undermine the *Miranda* warnings," particularly when it creates circumstances in which "a suspect would hardly think he had a genuine right to remain silent . . . ." *Missouri v Seibert*, 542 US 600, 613, 616; 124 S Ct 2601; 159 L Ed 2d 643 (2004) (opinion by Souter, J.); see also *id*. at 613 (observing that when a suspect is read their rights after interrogation, the suspect would likely feel "perplexity about the reason for discussing rights at that point" and noting that such "bewilderment" is "an unpromising frame of mind for knowledgeable decision[-making]").

Instead of providing counsel, defendant was told: "You don't got one," "You don't have a lawyer," and "We tried to call one. Ain't nobody available and you ain't got no money." These statements after the invocation of counsel can reasonably be understood, as indicated by the trial court, as suggesting that defendant's right to have an attorney present during questioning was dependent on his ability to retain counsel through his own

16

funds. The statements are not consistent with *Miranda*'s assertions that suspects have a right to counsel and that, if they cannot afford counsel, counsel will be provided.

Following this exchange, defendant's confusion and lack of understanding is apparent from the record. He repeatedly told his interrogators that he was "confused" and "d[idn't] understand." Defendant's response was understandable. Police spent hours purportedly looking for an attorney, then returned to take him to jail without providing any update on their efforts to secure counsel. When defendant asked where his lawyer was, he was told that he did not have an attorney, that he did not have money for an attorney, and that no other attorney was available. When told that a lawyer was not available, defendant asked multiple clarifying questions and stated that he was confused. When police later read defendant his rights again and asked if he had been coerced to make a statement, defendant said that he did not understand.

Police did not err because they failed to provide an attorney.[16] After all, "*Miranda* does not require that attorneys be producible on call," but instead merely requires that a suspect must be informed "that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Duckworth*, 492 US at 204. See also *People v Lewis*, 47 Mich App 450, 453; 209 NW2d 450 (1973) ("We are not unmindful that the police may have acted innocently by stating that an attorney was not available at that time of the day. Nonetheless, the police were not free to ignore the letter and spirit of *Miranda*, and the questioning should have ceased until

---

[16] While there were questions in the Court of Appeals about the extent of the effort that police put into obtaining counsel and the procedure they used, we do not look to these in our analysis.

such time as counsel could have been secured on behalf of the defendant."); *People v Myers*, 158 Mich App 1, 12; 404 NW2d 677 (1987) ("On the other hand, where, as in *Lewis*, . . . the police respond that counsel is *not* available, without making any indication that counsel will be available in the immediate future, any additional statements by defendant do *not* constitute a waiver."). After invocation, police can end questioning and allow a defendant to go through the standard arraignment process for the appointment of counsel.[17] Instead, the police here erred by suggesting that defendant could not be questioned with an attorney present because he did not have the money to hire one.[18] This confusing and inaccurate information undermined the advice of rights previously read to defendant. See *State in re AS*, 203 NJ 131, 151; 999 A2d 1136 (2010) (" 'A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other.' "), quoting *State v Pillar*, 359 NJ Super 249, 268; 820 A2d 1 (App Div, 2003).[19]

---

[17] Judge GARRETT highlighted in her dissent that a suspect wishing to continue the interrogation at that moment must be able to retain counsel because the typical practice in this jurisdiction to obtain counsel after invocation during a prearraignment interrogation is to return a suspect to their cell and secure an arrest warrant. *Fenderson* (GARRETT, J., dissenting), unpub op at 4. If promptly arraigned after his assertion of the right to counsel, defendant would then have had an attorney appointed for him.

[18] The dissent argues that "the interaction between defendant and the police more reasonably indicates that the police informed defendant that they were taking him to detention because he did not *presently* have an attorney," but the dissent does not contend with the responses police gave to defendant's expressions of confusion and questions about using his own funds to hire an attorney and his inability to do so. These statements undermined the advice of rights and were not limited to defendant's present position without counsel.

[19] While officers can "accurately describe[]" the procedures for appointment of counsel, see *Duckworth*, 492 US at 204, several sister state courts have insisted that officers must take care in how they present this information, see *Mayer*, 184 Wash 2d at 559 ("[Officers]

The Court of Appeals majority suggested that defendant's statements are admissible because he was subsequently informed of *Miranda* again and, at that point, waived his *Miranda* rights. Simply reading the standard *Miranda* rights again does not meet the state's burden to show that the statements are admissible. Defendant was already aware of his rights. He referenced his right to an attorney multiple times throughout the interrogation. He expressed no initial confusion about his ability to invoke that right. He clearly did invoke that right after the tone of the interrogation had shifted. But defendant was given no reason to believe that if he were to invoke his right again, the outcome would be any different. He could ask for an attorney, but one would not be provided.

By undermining the advice of rights and implying that the right to have an attorney present during questioning was predicated on the ability to pay for an attorney, police in this case violated defendant's Fifth Amendment right to counsel under *Miranda*.

## 2. DEFENDANT DID NOT REINITIATE CONTACT

"Once a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact." *Tanner*, 496 Mich at 208, citing *Miranda*, 384 US at 473-474. Once a suspect has invoked his right to

---

cannot link the right to appointed counsel to future events that would occur, if ever, only after the interrogation[.]"); *Commonwealth v Libby*, 472 Mass 37, 54-55; 32 NE3d 890 (2015) ("[The officer's] statements that the right to appointed counsel does not attach until arraignment, that lawyers 'don't just come running out and sit in an interview,' and that the defendant would have to 'call' a lawyer puts into question whether, having no funds to hire counsel, the defendant believed speaking with an attorney before speaking to the police was an actual possibility."); *State v Climer*, 400 SW3d 537, 566 (Tenn, 2013) (holding that a *Miranda* waiver was invalid when the officer answered the suspect's question, " 'You mean I can have an uh an appointed lawyer right now?' " with " 'Well, not at this time' ").

counsel, the *suspect* must reinitiate the investigation in order for questioning to permissibly continue. *Edwards*, 451 US at 484-485.

The prosecution contends that the *Edwards* presumption of involuntariness was overcome because defendant reinitiated the interrogation. See *Tanner*, 496 Mich at 208-209 (providing that *Edwards* is not violated where it can be shown that " 'the accused himself initiate[d] further communication, exchanges, or conversations with the police' "), quoting *Edwards*, 451 US at 484-485; *Oregon v Bradshaw*, 462 US 1039, 1045-1046; 103 S Ct 2830; 77 L Ed 2d 405 (1983) (opinion by Rehnquist, J.) (stating that *Edwards* does not require suppression where a defendant initiates conversation that an officer could reasonably interpret as relating generally to the investigation and where another valid waiver of rights is given). Our Court has not squarely addressed a case involving allegations of reinitiation after *Miranda* invocation prior to this one.[20]

We conclude that the prosecution has not shown that defendant reinitiated the interrogation under *Edwards*. We look to the statements that defendant made when police returned from their effort to obtain counsel for him. The prosecution asserts that defendant

---

[20] While subsequently overruled, the United States Supreme Court had previously extended the *Edwards* rule to Sixth Amendment cases. See *Michigan v Jackson*, 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986), overruled by *Montejo v Louisiana*, 556 US 778 (2009). In *People v McRae*, 469 Mich 704, 707-708; 678 NW2d 425 (2004), we examined a Sixth Amendment case involving the questioning of an accused in jail by a deputy sheriff where there was a discussion of reinitiation. In that case, we concluded that the defendant did not reinitiate. *Id*. at 716-717. Our analysis is not changed by *People v Kowalski*, 230 Mich App 464; 584 NW2d 613 (1998), which is cited by the dissent. In *Kowalski*, the Court of Appeals applied 1976 law and noted that the defendant had to show that *Edwards* applied to his case. *Id*. at 477. Further, the facts in this case do not suggest, as the split Court of Appeals panel concluded when assuming that *Edwards* did apply, "a mere inquiry into whether an accused has changed his mind about wanting to speak without an attorney present . . . ." *Id*. at 479.

20

reinitiated when he asked Beasley, "So what's going on?" after Beasley returned from an extended absence that Beasley told defendant was for the purpose of trying to find an attorney for him.[21]

Defendant's first question when Beasley returned after being absent for more than two and a half hours, purportedly to find an attorney for defendant, was, "Where . . . where my lawyer?" This inquiry was limited to effectuating defendant's invoked right to counsel, which Beasley had previously indicated he was attempting to arrange. Defendant's next question was, "Wait . . . huh?" in response to Beasley's statement, "You don't got one." Defendant's "huh" was related to his lack of appointed counsel. Defendant then asked if police could use the money that he had in his possession when he was arrested to procure an attorney. Police told him that he could not use this money for an attorney to represent him at his interrogation.

Then defendant asked, "So what's going on?" In the context of a discussion about whether, having invoked his right to counsel, he had an attorney and whether he could use the money he had for an attorney, the question "So what's going on?" cannot reasonably be considered an affirmative request to reinitiate the interrogation without an attorney. Perhaps in other settings these words might lead a reasonable police officer to believe that

---

[21] The prosecution in the trial court asserted a different alleged reinitiation. At the preliminary examination, the prosecution argued that defendant reinitiated when he "popped his head out" of the interrogation room during the two-and-a-half-hour span when he was left alone. This argument did not succeed then, nor does it fare better now. A review of the interrogation video does not make clear when defendant allegedly popped his head out. What it does show is that the interactions during the time he was waiting for police to return were related to his bodily needs—asking for a cigarette and to use the bathroom.

defendant was initiating conversation that related generally to the investigation. Finding so here would completely strip defendant's question from the context in which it was asked.[22] Defendant was still pursuing his constitutional right to have counsel at his interrogation and appeared confused about why he was being returned to jail after he had been told that police were attempting to find an attorney to be appointed for him. The trial court record lacks any findings with respect to defendant's reinitiation, and the prosecution has not borne its burden to show that defendant reinitiated. Defendant's questions about

[22] The prosecution asks us to analogize this case to *Bradshaw*, 462 US at 1042, 1045-1046 (opinion by Rehnquist, J.), where a plurality of the United States Supreme Court concluded that the suspect reinitiated questioning when he asked an officer, "Well, what is going to happen to me now?" In *Bradshaw*, a plurality of the Court determined that this "ambiguous" statement "evinced a willingness and a desire for a generalized discussion about the investigation[.]" *Id*. at 1045-1046. After the suspect invoked his right to counsel, the interrogation ended and the suspect was transported from the police station to the county jail; either just before or during this trip, the suspect was with an officer other than his original interrogator when the suspect inquired about what would happen to him. *Id*. at 1041-1042. That officer immediately told the suspect that he did not have to talk without an attorney, and the officer did not otherwise indicate that an attorney would not be available. *Id*. at 1042. Accordingly, "[o]n these facts," there was not an *Edwards* violation. *Id*. at 1046. As described above, defendant's statements in this case do not "evince[] a willingness and a desire for a generalized discussion about the investigation[.]" *Id*. at 1045-1046.

Moreover, the *Bradshaw* plurality recognized the distinction between asking generally about a case and asking questions specific to being detained. *Id*. at 1046 (providing that a suspect's "necessary inquiry arising out of the incidents of the custodial relationship" is not voluntary initiation that allows officers to restart the interrogation); see also *People v Sims*, 5 Cal 4th 405, 441-442; 853 P2d 992 (1993) (holding that the "defendant's remark in the present case—asking the police officers what was going to happen to him with reference to extradition—cannot, in itself, properly be construed as constituting a waiver of previously invoked rights"); *McDougal v State*, 277 Ga 493, 499-500; 591 SE2d 788 (2004) (noting that a suspect in a holding cell who sends word that he would like to speak to officers, without more, would not indicate an intent to engage in generalized discussion about the investigation because the suspect could have intended to inquire about when he would be allowed to contact family members or an attorney).

the status of his attorney were in pursuit of his invocation of the right to counsel, not an expression of willingness to talk generally about the investigation without counsel. See *Lewis*, 47 Mich App at 452-453 (holding that after officers told the defendant that they could not obtain counsel for him, the "defendant's statement to 'forget it' did not constitute a voluntary, knowing, and intelligent waiver of the right to counsel"). As a result, the subsequent *Miranda* waiver and questioning do not overcome *Edwards* and the confusion created about defendant's right to counsel.

### 3. POLICE REINITIATED QUESTIONING

After defendant asked what was going on, police engaged in the functional equivalent of questioning. This amounted to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v Innis*, 446 US 291, 301; 100 S Ct 1682; 64 L Ed 2d 297 (1980); *id*. at 300-301 ("*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). When determining whether police officers should know that their words or actions are reasonably likely to elicit an incriminating response, we focus our inquiry "primarily upon the perceptions of the suspect, rather than the intent of the police." *Id*. at 301.

After defendant was told that he did not have an attorney and could not use his money for an attorney, police continued the same theme from prior to defendant's invocation of counsel, where they suggested that defendant's story had holes and did not make sense. Defendant was told that because he asked for an attorney, "the story you got

is the story we gon' go with."  In their prior questioning, police had stated repeatedly that this story was one-sided—that defendant's story would, among other things, seem "fucked up" and that the evidence would make defendant look like a "callous killer,"[23] a tactic that had led to defendant's request for counsel.  The trial court also noted that right on the heels of the concerning statements regarding the lack of counsel, police said, " 'Well, we'll just go with the statements that we have.' "

At that point, defendant said that he was confused, and when he asked what it meant that police would "take [him] back to DDC" and submit a warrant, he was told that police could not talk to him.  Police told him that waiver of his rights was the way to tell another story and that otherwise he would be stuck with the prior story.  He was told: "Now if you wanted to talk to me, you just say that you want, you want to talk without an attorney.  I can talk to you."  Instead of honoring the invocation of rights or providing defendant with counsel, police engaged in further exchanges with defendant to prompt him to give a different story.  See *Innis*, 446 US at 301.

The Court of Appeals pointed to defendant's subsequent waiver of *Miranda* after this reinitiation by police.  However, we need to determine whether that subsequent waiver was voluntary and knowing, because a subsequent *Miranda* warning does not cure the *Edwards* violation that already occurred.  *Shatzer*, 559 US at 105 ("[A] voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's

---

[23] We let these words speak for themselves and respectfully disagree with the dissent's suggestion that they "do[] not imply anything negative about the content of the 'story' that the police would be using."

right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel.").

This is the questioning after the invocation of counsel that the Fifth Amendment and Article 1, § 17 prohibit. Instead of either providing counsel or terminating the interrogation, as required, police asserted that they were going to provide counsel but then stated that defendant did not have counsel and implied that counsel would not be provided because he did not have money. The prosecution cannot overcome the presumption that defendant's statements following his assertion of counsel were involuntary. *Edwards*, 451 US at 484. This constitutes a failure to scrupulously honor defendant's invocation of his right to counsel in violation of *Miranda* and *Edwards*. *Miranda*, 384 US at 480 (" 'In a government of laws, existence of the government will be imperilled [sic] if it fails to observe the law scrupulously.' "), quoting *Olmstead v United States*, 277 US 438, 485; 48 S Ct 564; 72 L Ed 944 (1928), overruled in part on other grounds by *Katz v United States*, 389 US 347 (1967). Accordingly, defendant's statements subsequent to invocation of his right to counsel must be suppressed.

III. CONCLUSION

The Court of Appeals erred in reversing the trial court's order suppressing defendant's postinvocation statements. The trial court correctly concluded that defendant's waiver was invalid. Police undermined the advice of rights required by *Miranda* and impermissibly continued the interrogation after defendant invoked his right to counsel. Under both the federal and state Constitutions, suppression is required. Accordingly, we

25

reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings.

Kimberly A. Thomas
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Noah P. Hood

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                        No. 167391

DAREN DONELL FENDERSON,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

A majority of this Court holds that the Court of Appeals erred in reversing the trial court's order suppressing defendant's statements after invocation of his *Miranda*[1] rights. I disagree. A review of the record firmly indicates that there were no violations of defendant's constitutional rights. To the contrary, the police did exactly what was required of them under the Fifth Amendment and applicable caselaw. Police ceased questioning defendant as soon as he requested an attorney; they attempted to locate an attorney for defendant; they informed defendant that they could not locate an attorney, and therefore all interrogation would cease; when asked, they explained to defendant what the next steps in the process would be; when defendant stated that he wanted to talk without an attorney, they asked defendant to make sure that is what he wanted, repeatedly telling him not to feel compelled to speak to them; and before restarting their interrogation of defendant, they again informed him of his *Miranda* rights to confirm that defendant was making a valid

_____

[1] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

waiver of his right to be free from self-incrimination. Viewed as a whole, the conduct of the Detroit Police Department exemplifies sound police work that was fully consistent with constitutional principles. I agree with the Court of Appeals' majority opinion that defendant's decision to waive his rights was made voluntarily, knowingly, and intelligently and that the officers did not violate defendant's right to be free from self-incrimination under the Fifth Amendment of the United States Constitution or Article 1, § 17 of the 1963 Michigan Constitution. Accordingly, I would affirm the judgment of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

Defendant awaits trial on charges of first-degree premeditated murder, MCL 750.316(1)(a); felony-firearm, MCL 750.227b; and escape from lawful custody, MCL 750.197a.[2] These charges arise out of the death of William Allen in Detroit on August 1, 2022. Testimony presented at the preliminary examination established that officers found the victim's body pinned between a house and a red Dodge Journey registered to defendant. An autopsy revealed multiple gunshot wounds as well as blunt force trauma consistent with the victim's having been run down by an automobile.

Police arrested defendant the next day and brought him to the Detroit Public Safety Headquarters, where he was informed of his *Miranda* rights. Although defendant agreed to waive his rights, the officers believed that he was too intoxicated to interrogate at that time. Defendant was thus taken to the Detroit Detention Center (the DDC) where he spent the night in custody.

---

[2] The limited record before this Court does not disclose the basis for the escape charge.

The next day, police again transported defendant to the Detroit Public Safety Headquarters where Detroit Police Sergeant Reginald Beasley advised defendant of his *Miranda* rights by reading them aloud from a written form. Defendant initialed and signed the form. He then stated: "I got a question. Is it best to have a lawyer here?" When told that was up to him, defendant said: "I see the—the one where it say that one will be appointed, but I don't wanna take up ya'll time . . . . I would rather just an—answer the questions here and get this over with." After police confirmed that defendant was willing to talk without a lawyer, defendant spoke with Beasley and Detective Douglas Williams for about an hour.

During this initial interrogation, defendant told the police officers that he was carjacked on the night of the victim's death and that the carjacker must have been driving defendant's vehicle when the victim was killed. The officers interrupted defendant, however, and told him that they had surveillance-video footage that showed him driving the vehicle. The officers also pointed out other inconsistences in defendant's story. Williams left the room, and defendant eventually told Beasley that he would tell him what he "want[ed] to hear but can [he] have a lawyer first?" When Beasley asked if defendant had a lawyer, defendant answered: "No. Y'all gonna appoint one right?" Beasley indicated that he would make some calls and left defendant alone in the interrogation room for more than two and a half hours, but defendant was given beverages and restroom breaks.

Beasley and another member of the Detroit Police Department, Sergeant Paul Brown, separately called the control center in an attempt to get what they described as "a show cause" or show-up attorney. Brown understood there to be an attorney on duty that day, but that attorney was only available for lineups. The officers would later testify that

there were ongoing efforts to try to get an attorney after that, but they did not document those efforts or specifically describe them in their testimony. In total, Brown estimated that he spent roughly 10 to 15 minutes trying to find an attorney. The officers were not able to locate an attorney to attend the interrogation.

After a few minutes alone in the interrogation room, defendant expressed concern to himself that "they [are] trying to get me to confess" to something he did not do. After about 40 minutes, Beasley returned to the interrogation room and told defendant that he was still working on finding an attorney for him.

Roughly two hours later, Beasley returned to the interview room with a uniformed officer. The uniformed officer undid defendant's handcuffs and then asked defendant to turn around so that he could handcuff defendant with his hands behind his back. Defendant asked, "Where . . . where [is] my lawyer?" Beasley answered, "You don't got one." Defendant again sought clarification, prompting Beasley to explain: "We tried to call one. Ain't nobody available and you ain't got no money." Defendant mentioned the money he had in his possession when he was arrested, but Beasley told him that he could not use that money. Defendant again sought clarification, asking, "So what's going on?" Beasley replied: "You said you wanted an attorney. I can't talk to you no more without an attorney. So the story you gave is the story we gon' go with."[3]

---

[3] The majority opinion states that Beasley said, " '[S]o the story you *got* is the story we gon' go with.' " (Emphasis added.) This portion of the interrogation video is a bit muffled and difficult to decipher, but I believe that Beasley said, "[T]he story you *gave* is the story we gon' go with." (Emphasis added.) This distinction makes no substantive difference to my analysis; I note this discrepancy only because I refer to this statement in my analysis.

As the uniformed officer was patting defendant down and Beasley was cleaning up the interview room, defendant said, "I'm confused then." Beasley asked defendant what he was confused about, and defendant responded: "I don't know what's going on from this point. You ain't told me nothing." Beasley replied: "What's going to happen now, we're gonna take you back to [the] DDC. Then we gonna submit a warrant, and the prosecutor will review it, all right?" Defendant responded, "I'm not sure what all that mean[s]," to which Beasley replied: "You requested an attorney. I can't, I can't talk to you any more about the case . . . . Now if you wanted to talk to me, you just say that you want, you want to talk without an attorney. I can talk to you. But you said you wanted an attorney. I'm not allowed to talk to you by law."

After Beasley's second explanation that he could not talk to defendant because defendant requested an attorney, defendant stated: "I just want to get this over with. If you tryna talk we can talk. I just want to get this over with. That's it. I just want to get this over with." Beasley then informed defendant, "I can go over your rights again with you, if you agree to talk without an attorney—" and defendant interrupted: "I agree to talk without an attorney. Y'all heard that? I agree. I just want to get this over with." Beasley and defendant then had the following exchange:

> *Beasley*: I don't want you to feel compelled to talk to me because you don't want to go with them. That's the thing. But if you reasonably want to talk to me without an attorney present, I—I'll talk to you. But you understand that's something that you want to do.
>
> *Defendant*: Yeah.
>
> *Beasley*: I don't want you to feel like you're forced to—
>
> *Defendant*: Ok.

5

> *Beasley*: —do anything.  Is that something you want to do?
>
> *Defendant*: Yes.

Beasley then stepped out of the room, and Brown came in.  Defendant said, "I don't understand this," and Brown responded: "So, I'm independent from the investigation.  I have no knowledge of what's going on."  Defendant interrupted and said: "This cannot be right, this investigation is not goin' right, everything is not going right, man.  I'm trying to see . . . ."  Brown interrupted defendant and said: "Well, check this out.  You'll talk with the detectives about that.  I just gotta reestablish your rights so you can speak to 'em.  Okay?  Because . . . you said you want to talk to 'em again."  Defendant responded, "Yes . . . I got a problem."  Brown then asked defendant for his name and date of birth and read the *Miranda* form out loud to defendant.  After reading the rights, Brown asked, "No one has forced you, threatened you, or coerced you to give a statement, right?"  Defendant and Brown then had the following exchange:

> *Defendant*: See that's what I . . . don't understand what's going on—
>
> *Brown*: Now, I'm specifically talking about this [gesturing to the *Miranda* form].
>
> *Defendant*: Uh . . . Yeah . . . .
>
> *Brown*: You wanna . . . you wanna talk to them.
>
> *Defendant*: Yes.
>
> *Brown*: Okay, that's all I'm asking.  Okay.  And . . . so, what you're gonna do, so since you've reestablished those, you just put your initials there, and put your signature there.

After defendant initialed and signed the form, Brown asked, "And . . . you wanna talk to them freely?"  Defendant responded, "Yeah, I wanna talk to 'em."

Beasley and Williams returned and resumed the interrogation. During the final portion of the interrogation, both Beasley and Williams cursed and yelled at defendant. Beasley then said: "This is what's gonna happen. You're gonna sit here and you're gonna roll the fuckin' dice. We're gonna take this big ass fuckin' file, give it to the fuckin' prosecutor, they're gonna review it. Somebody who . . . they're not from the hood. They don't understand this shit. They don't understand the fuckin' streets. All they're gonna see is you sittin' in this fuckin' room lying your fuckin' ass off. And they're going to say he a fuckin' stone cold fuckin' killer."

At this point, defendant leaned back in his chair and covered his face with his hands. He started sobbing, which prompted Beasley to say, "Stop all that fuckin' crying." Williams also yelled at defendant to stop crying and to stop playing games. Beasley asked, "Are you a stone cold killer?" Defendant responded, "No." Beasley said: "Then tell us why the fuck it happened. That's [what] we need to know." Defendant then admitted that he had fired at the victim and hit him with his car, claiming that he had done so in self-defense.

The prosecution charged defendant with first-degree premeditated murder, felony-firearm, and escape from lawful custody. After a two-day preliminary examination, the district court bound defendant over for trial on all charges. Defendant subsequently moved to suppress the inculpatory statements he made after invoking his right to counsel. The trial court granted the motion, reasoning that Beasley's communications with defendant had frustrated the advice of rights required by *Miranda*. The trial court agreed to enter a stay of proceedings to allow the prosecution to pursue an interlocutory appeal.

7

The prosecution applied for leave to appeal in the Court of Appeals, which granted the application. The Court of Appeals then reversed the trial court's suppression ruling in a split, unpublished opinion, holding that the trial court erred by finding that the officers coerced defendant into making the challenged statement.[4] Judge GARRETT dissented, opining that Beasley impermissibly interrogated defendant after defendant's invocation of his right to have counsel present, such that defendant's subsequent confession was obtained in violation of *Edwards v Arizona*.[5] The dissent also believed that Beasley misled defendant about his right to counsel, which prevented him from knowingly and voluntarily waiving that right after initially invoking it.

Defendant sought leave to appeal in this Court. We ordered oral argument on the application, asking the parties to address whether "the Court of Appeals erred by reversing the trial court's decision to grant the defendant's motion to suppress statements."[6] In particular, we asked the parties to address

> whether the defendant's decision to waive his rights under *Miranda v Arizona*, 384 US 436[; 86 S Ct 1602; 16 L Ed 2d 694] (1966), was made " 'voluntarily, knowingly, and intelligently,' " *People v Tanner*, 496 Mich 199, 209[; 853 NW2d 653] (2014), quoting *Miranda*, 384 US at 444, and whether the interrogating officers' statements and conduct violated defendant's right to be free from self-incrimination under the Fifth

---

[4] *People v Fenderson*, unpublished per curiam opinion of the Court of Appeals, issued June 6, 2024 (Docket No. 367926), pp 1, 3-4.

[5] *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

[6] *People v Fenderson*, 516 Mich 934, 935 (2025).

8

Amendment of the United States Constitution or Article 1, § 17 of the Michigan Constitution.[7]

## II. STANDARD OF REVIEW

This Court reviews a trial court's factual findings in a ruling on a motion to suppress for clear error.[8] To the extent that the trial court's ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, review is de novo.[9]

## III. LEGAL BACKGROUND

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."[10] This federal constitutional guarantee was made applicable to the states through the Fourteenth Amendment.[11]

Statements of an accused made during custodial interrogation are inadmissible absent a voluntary, knowing, and intelligent waiver of the accused's Fifth Amendment rights.[12] The United States Supreme Court held in *Miranda v Arizona* that the accused

---

[7] *Id.*

[8] *Tanner*, 496 Mich at 206.

[9] *Id.*

[10] US Const, Am V. See also Const 1963, art 1, § 17 (containing an identical self-incrimination clause).

[11] *Malloy v Hogan*, 378 US 1, 3; 84 S Ct 1489; 12 L Ed 2d 653 (1964).

[12] *Miranda*, 384 US at 444. The test of voluntariness is whether, considering the totality of the circumstances, "the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired." *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (citation modified). The following factors should be considered when determining the voluntariness of a statement:

must be given a series of warnings before being subjected to "custodial interrogation" in order to protect his constitutional privilege against self-incrimination.[13] "The right to have counsel present during custodial interrogation is, in the words of the United States Supreme Court, a corollary of the right against compelled self-incrimination, because the presence of counsel at this stage affords a way to 'insure that statements made in the government-established atmosphere are not the product of compulsion.' "[14] "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one."[15]  If a suspect is not afforded *Miranda* warnings before custodial interrogation, "no evidence obtained as a result of interrogation

---

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.  [*Id*. at 334 (citations omitted).]

[13] *Miranda*, 384 US at 444-445, 477-479.  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Id*. at 444.

[14] *Tanner*, 496 Mich at 207, quoting *Miranda*, 384 US at 466.

[15] *Duckworth v Eagan*, 492 US 195, 204; 109 S Ct 2875; 106 L Ed 2d 166 (1989).

can be used against him."[16]  "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[17]

"Once a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact."[18]  In *Edwards v Arizona*, the United States Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights."[19]  Rather, it must be shown that "the accused himself initiate[d] further communication, exchanges, or conversations with the police."[20]

## IV.  ANALYSIS

I agree with the Court of Appeals' majority that the trial court erred in suppressing defendant's confession, as a review of the record firmly indicates that there were no violations of defendant's constitutional rights.  To the contrary, the police did exactly what was required of them under the Fifth Amendment and applicable caselaw.

---

[16] *Miranda*, 384 US at 479.

[17] *Rhode Island v Innis*, 446 US 291, 301; 100 S Ct 1682; 64 L Ed 2d 297 (1980).

[18] *Tanner*, 496 Mich at 208, citing *Miranda*, 384 US at 473-474.

[19] *Edwards*, 451 US at 484.

[20] *Id*. at 484-485.

11

After defendant invoked his right to counsel, the police immediately ceased the interrogation and attempted to secure counsel for defendant. The police left defendant in the interview room by himself for about two and a half hours before determining that no counsel was available and returning to take defendant back to detention. During that time, defendant was free to move around the room, and he was afforded drinks and the opportunity to relieve himself. The police then told defendant that, because he had no attorney, they could not talk to him. This prompted defendant to reinitiate the conversation. Based on a careful review of what was said, I cannot conclude that the police pressured or manipulated defendant into resuming the interrogation without counsel present or otherwise engaged in conduct that would undermine the validity of his *Miranda* waiver.

Defendant raises two related Fifth Amendment challenges. First, defendant argues that the police manipulated and coerced him into involuntarily waiving his right to counsel by making him think that he would not receive an attorney. Second, defendant argues that, contrary to the United States Supreme Court's *Edwards* precedent, the police continued to question defendant about the case after he had invoked his Fifth Amendment right to counsel and without defendant's having reinitiated the conversation. Both arguments are devoid of merit.

A. DEFENDANT'S *MIRANDA* WAIVER WAS MADE VOLUNTARILY

The majority opinion concludes that, "[b]y undermining the advice of rights and implying that the right to have an attorney present during questioning was predicated on the ability to pay for an attorney, police in this case violated defendant's Fifth Amendment right to counsel under *Miranda*." Specifically, the majority opines that "the police here

12

erred by suggesting that defendant could not be questioned with an attorney present because he did not have the money to hire one. This confusing and inaccurate information undermined the advice of rights previously read to defendant." I disagree.

Defendant's arguments on voluntariness rely on a combination of misrepresented facts and misunderstood law. The voluntariness of a defendant's waiver of *Miranda* rights depends on the absence of police coercion; the defendant must waive his rights freely and deliberately, rather than as the product of coercion.[21] The legal analysis for the voluntariness of a *Miranda* waiver is essentially the same as that for the voluntariness of a confession.[22] Watching the video of the interrogation in full, I detect no coercive behavior on the part of the police officers.

Defendant's evidence of police coercion largely turns on his incorrect depiction of the facts. Defendant emphasizes that, when he asked where his attorney was, Beasley responded, "You don't get one." Defendant asserts that, when he pressed for an explanation, the officer told him that because he didn't have any money, "[a]in't nobody coming." But the video clearly shows that Beasley did not say, "You don't get one." He said, "You don't *got* one." There is a subtle but significant difference in meaning between these statements. "You don't get one" plausibly implies that, not only does defendant not currently have an attorney, but he will not be receiving one. According to defendant and

---

[21] *People v Daoud*, 462 Mich 621, 635; 614 NW2d 152 (2000). See *Colorado v Connelly*, 479 US 157, 167; 107 S Ct 515; 93 L Ed 2d 473 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").

[22] *People v Ryan*, 295 Mich App 388, 397; 819 NW2d 55 (2012), citing *Daoud*, 462 Mich at 635.

13

the trial court, this is the meaning that caused defendant to conclude that asserting his rights would be futile. "You don't got one," on the other hand, is a more limited statement. "Got" implies that defendant does not have an attorney right now, but it does not carry the forward-looking insinuation of "get." Because Beasley said "got" and not "get," this crucial factual premise of defendant's involuntary-waiver argument crumbles.

Similarly, defendant claims that Beasley said, "Ain't nobody coming," which, again, carries a future-oriented connotation. It could suggest to defendant that nobody will be coming to help him at all, not just that no attorney was currently available to assist him. Here, too, defendant's factual premise is incorrect. Although what Beasley said is less clear here, the video indicates that Beasley said, "Ain't nobody *available*."

With these factual bases taken away, defendant's assertion of police coercion and intimidation has little to stand on.[23] A more accurate view of the facts is that Beasley told defendant that he was unable to find an attorney currently available, that the law required Beasley to end the questioning, and that defendant would therefore be returned to jail for the time being. This is exactly what is required by the Fifth Amendment and the applicable caselaw. The majority opinion glosses over Beasley's repeated words of caution to

---

[23] The majority opinion holds that the police erred by suggesting that defendant could not be questioned with an attorney present because he did not have the money to hire one. But for the reasons just discussed, I believe the interaction between defendant and the police more reasonably indicates that the police informed defendant that they were taking him to detention because he did not *presently* have an attorney, all of which is factually and legally accurate. After a review of the interrogation video, I do not believe the officers indicated that defendant would never be entitled to an attorney. As is discussed below, there is no authority for the proposition that, when a defendant asks to continue questioning but with counsel present, the police may not cease questioning entirely.

defendant—that defendant did not have to talk and should not feel compelled or forced to speak with police. Indeed, Beasley explicitly stated that he did not want defendant to feel compelled to talk to him and that he did not want defendant to feel "forced to do anything."

As for defendant's argument that being isolated and handcuffed in the interview room for about two and a half hours after he asked for an attorney deprived him of willpower, this does not withstand scrutiny. Although it was, no doubt, an unpleasant experience for defendant, nothing he experienced was onerous, grueling, or plausibly capable of undermining his voluntary decision-making. There is nothing extreme about this situation. Defendant was free to move about the room, he had beverages, and he was allowed to use the restroom. And two and a half hours in a room alone is hardly severe treatment. While there was a period where defendant was crying and the police were yelling at him, this constituted only a brief period of the interrogation. Aside from all this, both Beasley and the officer who recorded defendant's second *Miranda* waiver repeatedly stressed that defendant did not have to talk and that he should not feel compelled or forced to say anything.

After carefully reviewing the interrogation, I am left with the firm belief that the police did not engage in coercive conduct, which is the touchstone of a Fifth Amendment violation.[24] Nor did they say anything that would reasonably lead defendant to believe that he did not have the right to an attorney. The police were ending the interrogation and taking defendant back to jail when the exchange in question occurred. It is hard to see how this could have caused defendant to believe that he had no choice but to waive his rights

---

[24] *Daoud*, 462 Mich at 635.

and speak to the police. Even if the police had led defendant to think that he would not be receiving a lawyer, there was still no coercion to *talk* to the police, which is exactly what the Fifth Amendment protects against. Accordingly, there was no coercion to waive defendant's *Miranda* rights. To the contrary, the police telling a defendant that the interview is over, that they cannot talk to him, and that they will be returning him to jail is, if anything, the opposite of coercion to waive one's rights and talk. It makes extremely clear that there is an alternative to waiver. The police did exactly what they were required to do.

In sum, defendant was fully informed of his constitutional rights on three separate occasions, and he affirmed that he understood his rights each time. The record does not indicate that there was any unnecessary delay in this process, and further, there were no signs that defendant was intoxicated, drugged, or otherwise incapacitated during later attempts to interrogate him. For all these reasons, and because I detect no coercive behavior on the part of the officers, I disagree with the majority opinion that the officers violated defendant's *Miranda* rights.

### B. THE POLICE DID NOT IMPROPERLY REINITIATE CONTACT WITH DEFENDANT IN VIOLATION OF *EDWARDS v ARIZONA*

Defendant alternatively invokes the rule from *Edwards v Arizona* that, after a defendant has invoked his Fifth Amendment right to counsel, police must cease questioning until either an attorney is present or the defendant has voluntarily reinitiated contact with police and validly waived his *Miranda* rights.[25] Defendant argues that the police coerced

---

[25] *Edwards*, 451 US at 484-485.

him into reinitiating the interview by telling him that he would not receive a lawyer, that they were ending the interrogation, and that they would be applying for an arrest warrant with the information they already had. The majority opinion holds that "[t]he trial court record lacks any findings with respect to defendant's reinitiation . . . . Defendant's questions about the status of his attorney were in pursuit of his invocation of the right to counsel, not an expression of willingness to talk generally about the investigation without counsel." According to the majority, it was the police who reinitiated contact by "engag[ing] in the functional equivalent of questioning" after defendant asked what was going on.[26] I disagree. Although the police were unable to secure an attorney for defendant and told him as much, they did not reinitiate contact with defendant or continue the interrogation. Nor did the officers pressure defendant into reinitiating the interview. Instead, it was *defendant* who reinitiated contact and went on to make incriminating statements.

Defendant's argument misunderstands the Fifth Amendment. Of course, the "right to counsel" under the Fifth Amendment is not provided by the Constitution. Instead, it is a judicially created safeguard intended to protect the constitutional right against self-incrimination.[27] The same is true of the *Edwards* rule against police-initiated contact after a defendant has invoked the right to counsel.[28] These safeguards must be understood not

---

[26] The majority opinion cites *Innis*, 446 US at 300-301, to support its holding.

[27] *Michigan v Harvey*, 494 US 344, 350; 110 S Ct 1176; 108 L Ed 2d 293 (1990).

[28] *Id*.

as standing alone, but within the context of the Fifth Amendment right against self-incrimination.

When no attorney was available, the police did exactly what they were supposed to do to protect defendant's right against self-incrimination: They told defendant that he did not have an attorney, that they could not speak to him without an attorney, and that they therefore were ending the interview. Critically, they did not initiate any questioning of defendant. As the Court of Appeals' majority noted, had defendant simply remained silent, the officers would have taken him back to the detention center. At no point before defendant stated that he wanted to speak with them again without an attorney did an officer ask him questions about the offense. Without additional manipulative or coercive actions by police, it is difficult to see how a safeguard that exists to protect the right against self-incrimination—the requirement that police end an interview with a defendant if counsel is not present—can itself be deemed a coercive tactic to make the defendant restart the conversation.

The police had no obligation to talk to defendant about the case, with counsel or otherwise. Indeed, at that point, the police were obligated *not* to talk to defendant about the case. There is no authority for the proposition that, when a defendant asks to continue questioning but with counsel present, the police may not cease questioning entirely. In a sense, this would be the *opposite* of the right to maintain silence, which is the right that the Fifth Amendment protects. That defendant apparently felt some pressure to share his side of the story with police rather than end the interview entirely was, at worst, a side effect of the prophylactic rule meant to protect his rights.

Defendant reinitiated the interview, and the police simply provided clarifying information before defendant repeatedly stated that he wished to speak to them without an attorney. Defendant asked, "So what's going on?" When told he was to be transferred to the detention center, he expressed confusion. When asked what he was confused about, defendant responded: "I don't know what's going on from this point. You ain't told me nothing." When the officer explained, "What's going to happen now, we're gonna take you back to [the] DDC. Then we gonna submit a warrant, and the prosecutor will review it, all right?" defendant responded, "I'm not sure what all that mean[s]." The officer explained: "You requested an attorney. I can't, I can't talk to you any more about the case . . . . Now if you wanted to talk to me, you just say that you want, you want to talk without an attorney. I can talk to you. But you said you wanted an attorney. I'm not allowed to talk to you by law." Defendant then said: "I just want to get this over with. If you tryna talk we can talk. I just want to get this over with. That's it. I just want to get this over with." And when again told, "I can go over your rights again with you, if you agree to talk without an attorney—" defendant interrupted: "I agree to talk without an attorney. Y'all heard that? I agree. I just want to get this over with." And then, when the officer offered to go over defendant's rights again, including whether defendant would want to talk without an attorney, defendant unequivocally and emphatically said, "I agree to talk without an attorney." The officer cautioned defendant multiple times, saying that he did not want defendant to feel compelled or forced to speak.[29] But defendant repeatedly

---

[29] Indeed, Beasley said to defendant: "I don't want you to feel compelled to talk to me because you don't want to go with them. That's the thing. Now if you reasonably want to talk to me without an attorney present, I—I'll talk to you. But you understand that's something that you want to do." Beasley further said to defendant: "I don't want you to

confirmed that he wanted to talk about the case, at which point the police secured a waiver of his *Miranda* rights. The totality of the circumstances leaves no doubt that no *Edwards* violation occurred in this case.

The majority opinion reasons that defendant did not reinitiate contact because he was merely inquiring and expressing confusion as to the status of counsel's whereabouts. According to the majority, defendant's question "So what's going on?" "cannot reasonably be considered an affirmative request to reinitiate the interrogation without an attorney." It is true that the question "So what's going on?" would not itself constitute the reinitiation of an interrogation by a defendant. But it does not follow that the officer's response to this question in turn constituted reinitiation of the interrogation. Defendant started the conversation by asking what was happening, and the police simply answered defendant's questions as to what was happening and explained the next steps in the process, all of which were legally accurate.[30] Phrased differently, while the police engaged in a conversation with defendant, it was solely to answer the questions asked by defendant and clarify the next steps in the process. Beasley's reminder to defendant that he could not speak with defendant absent an attorney is a completely accurate statement of the law. It was only after Beasley made this statement of the law that defendant stated he would speak to them,

---

feel like you're forced to . . . do anything. Is that something you want to do?" This can hardly be viewed as coercive police conduct.

[30] See *People v Adams*, 245 Mich App 226, 236-239; 627 NW2d 623 (2001) (approving of an inquiry by police to clarify whether the defendant was reinitiating a discussion with them without the presence of a lawyer); *People v Kowalski*, 230 Mich App 464, 479; 584 NW2d 613 (1998) ("As a general principle, a mere inquiry into whether an accused has changed his mind about wanting to speak without an attorney present is not considered 'interrogation' within the meaning of *Edwards*."), lv den 459 Mich 995 (1999).

thus reinitiating the interrogation. After exhaustively confirming that defendant wanted to speak, the officers obtained another waiver, and it was only then that the officers asked defendant anything about the underlying offense.

The only statement by the officer that could potentially fall into the coercive category was: "You said you wanted an attorney. I can't talk to you no more without an attorney. So the story you gave is the story we gon' go with." Although this suggested that the police would be moving forward without further questioning, it does not imply anything negative about the content of the "story" that the police would be using. Indeed, the officer's use of "the story *you* gave" is significant and distinguishable from the trial court's paraphrases—"the statements that we have . . . the story that we have" and especially "we're gonna go with the story that we have that you're a stone-cold killer." The officer's statement merely implied that the police would be relating defendant's story as he had told it. The story that defendant had given at that point was that he had not been in the car at all because his car had been stolen. Although defendant's story seemingly conflicted with video evidence, and defendant knew it, the statements he had made did not themselves incriminate him.

Indeed, we would generally expect that the version of events that defendant had already shared would be *less* incriminating than anything he might share later. After all, he started with a version in which he had absolutely nothing to do with the killing and changed his tune only after the police showed him evidence that his prior story was false. Arguably, Beasley's statement about "the story you gave" should have prompted defendant to think that he was better off saying nothing rather than moving forward with more questioning, even if there was an attorney present. The officer's statement also did not

21

reasonably imply that defendant would never have an opportunity to share his (revised) version of events—only that he would not be able to share it before the next stage in the process, which, as the officer explained, was to apply for a warrant.

In sum, defendant's *Edwards* argument seems to be that if a defendant invokes his Fifth Amendment right to counsel but indicates a willingness to continue questioning with counsel present, it is necessarily coercive if police then decline to continue the interview. According to defendant, any statement by police that the interview would not be continuing would be "reasonably likely to elicit an incriminating response" and thus the functional equivalent of interrogation.[31] At that point, the defendant would not be able to reinitiate the conversation without it being due to police coercion and manipulation. It would then be impossible for the *Edwards* defendant-reinitiation scenario to occur. There is no authority for this type of per se rule.

Beasley told defendant in straightforward language that no attorney was presently available, that the law required them to end the interview, and that the police would be using the statements that defendant had already given. The record is devoid of police behavior that would render defendant's decision to reinitiate the discussion involuntary or that would qualify as the subsequent discussion being police-initiated.[32] Instead, the record

---

[31] *Innis*, 446 US at 302.

[32] The events here are less plausibly police-initiated than those in *Kowalski*, 230 Mich App at 477-484, where the Court of Appeals held that the defendant had reinitiated an interrogation and that *Edwards* was not violated. In *Kowalski*, the defendant was arrested on suspicion of a shooting. *Id*. at 467. He invoked his right to counsel under *Miranda*, and police ceased all questioning. *Id*. Simultaneously, police questioned and obtained a statement from a suspected coconspirator. *Id*. at 467-468. A detective went to the room where the defendant was located, told him that the coconspirator had given a statement,

22

confirms that defendant was able to make a voluntary, informed decision to reinitiate the conversation. Defendant is not entitled to relief.

## V. CONCLUSION

The police did everything they were constitutionally required to do in this case. They ceased questioning immediately once defendant requested an attorney; they attempted to locate an attorney for defendant; they informed defendant that they could not question defendant any further about the case because they could not find an attorney to counsel defendant during the interrogation; when asked, they explained to defendant what the next steps in the process would be; and when defendant stated that he wanted to talk without an attorney, they asked defendant to make sure that is what he wanted, repeatedly told him not to feel compelled to speak to them, and informed him of his rights again before accepting his waiver. This police conduct was not only constitutionally acceptable but required under the law. I therefore agree with the Court of Appeals' majority opinion that

---

said nothing about the content of the statement, and asked the defendant if he still wanted to talk to an attorney. *Id*. at 468. At that point, the defendant said that he did not need an attorney. *Id*. He waived his *Miranda* rights and confessed. *Id*. at 468-469.

The Court of Appeals in *Kowalski* held that this series of events did not violate *Edwards* because there was no police-initiated custodial interrogation. *Id*. at 478-479. The detective had asked the defendant nothing about the case and had not asked the defendant whether he wanted to talk about the case. The detective merely told the defendant that the other man had made a statement and asked whether the defendant still wanted to speak to an attorney. Only then did the defendant say that he wanted to talk about the case, initiating the subsequent interrogation. The *Kowalski* scenario of police telling a defendant that a co-suspect had made a statement and then asking him if he still wanted to talk to an attorney is undoubtedly a more suggestive and potentially manipulative situation than the one in this case. Yet the Court of Appeals in *Kowalski* found no violation of *Edwards*, and this Court denied leave to appeal.

23

defendant's decision to waive his rights was made voluntarily, knowingly, and intelligently and that the officers did not violate defendant's right to be free from self-incrimination under the Fifth Amendment of the United States Constitution or Article 1, § 17 of the 1963 Michigan Constitution.  Accordingly, I would affirm the judgment of the Court of Appeals.

Brian K. Zahra